RESPONDENT PRO SE
R. Mark Keaton

ATTORNEYS FOR THE INDIANA SUPREME COURT
DISCIPLINARY COMMISSION
G. Michael Witte, Executive Secretary
David B. Hughes, Staff Attorney
Allison Southgate Avery, Staff Attorney
Indianapolis, Indiana

# In the
# Indiana Supreme Court



FILED
Apr 21 2015, 10:02 am

CLERK
of the supreme court,
court of appeals and
tax court

No. 02S00-1302-DI-95

IN THE MATTER OF:

R. MARK KEATON,

*Respondent.*

Attorney Discipline Action
Hearing Officer Susan B. Eisenhauer

**April 21, 2015**

**Per Curiam.**

We find that Respondent, R. Mark Keaton, committed attorney misconduct by, among other things, engaging in an extreme and pervasive pattern of conduct involving harassment and dishonesty. For this misconduct, we conclude that Respondent should be disbarred.

This matter is before the Court on the report of the hearing officer appointed by this Court to hear evidence on the Indiana Supreme Court Disciplinary Commission's "Verified Complaint for Disciplinary Action," and on the post-hearing briefing by the parties. Respondent's 1998 admission to this state's bar subjects him to this Court's disciplinary jurisdiction. *See* IND. CONST. art. 7, § 4.

## Procedural Background and Facts

The Commission filed a three-count "Verified Complaint for Disciplinary Action" against Respondent on February 4, 2013. The hearing officer filed her report on September 12, 2014, which we now adopt and summarize.

Conduct involving "JD" (Count 1). In 2005, Respondent – who at the time was 41 years old, married, and lived in Fort Wayne – began an intimate relationship with JD, who at the time was a sophomore at Indiana University and the roommate of Respondent's daughter. Respondent and JD maintained a tempestuous long-distance relationship until March 2008, when JD permanently ended the relationship.

During the ensuing four months, Respondent left numerous voicemails for JD, 90 of which were recorded and preserved by JD. And from March 2008 through April 2010, at least 7,199 emails were exchanged between Respondent and JD, the vast majority sent by Respondent. Both Respondent's oral and written communications to JD were threatening, abusive, and highly manipulative in nature.[1]

One form of leverage over JD exploited by Respondent was financial. Respondent had borrowed about $8,000 from JD during their relationship, and JD needed this money repaid for her educational expenses. For several months after their break-up Respondent endeavored to

---

[1] One illustrative example among the many similar voicemails left by Respondent and preserved by JD is the following:

> (Shouting) Call me the f*** back! I don't know who the f*** you think you are. But I'll tell you what, you better f***ing call me f***ing back now! You f*** with me one more time and this time you'll really f***ing pay for it! And you need to think about it! Now you f***ing quit f***ing with me! I f***ing deal with your f***ing illness so f***ing long, don't f*** with me another f***ing day! Not another f***ing day! You return my call right now!

We agree with the hearing officer's assessment that "[t]he true angry, hostile and threatening content and tone present in the voicemails can only be fully understood" by listening to them. (HO's Report at ¶ 20). Quite simply, they are profoundly disturbing.

condition repayment on JD's agreement to communicate and meet with him. Respondent eventually repaid the money in September 2008, apparently believing that JD would respond the way he had hoped. When she did not, Respondent quickly sent a series of threatening emails within mere moments of one another, writing among other things that "This is a very dangerous situation. You have no idea. Telephone me immediately"; "You do not have class at noon. If you f*** with me this time, it will be the last time. Do you understand?"; and "Okay. Because you have chosen to ignore me, the worst will now happen. The worst. You have until 12:30 to telephone me."

On other occasions, Respondent threatened suicide unless JD would yield to his demands. For example, he wrote JD in one email that "I'm leaving the house for the roof. You must call and stop me or I'm gone. These emails will persist and everyone will find them and know you didn't call." In another email, Respondent wrote "I will kill myself tonight if I get one more instance of cruelty or indifference from you. I will do it. I have had enough. This is sick. So, I am asking you to drop the cruelty and indifference and engage in a rational caring exchange with me. Are you going to or not?"

Even more perniciously, Respondent threatened to publicly disseminate explicit photographs of JD taken during their relationship, and to contact JD's family, friends, acquaintances, and other third parties regarding Respondent's accusations that JD was a "whore" or a "slut" and that she suffered from mental illness and psychosis.[2] For example, in one voicemail message Respondent told JD, "What a f***ing whore. You've got exactly two f***ing minutes to email me or call me. Or these 10 f***ing emails are f***ing going. (laugh) I'm not f***ing kidding you. . . . You're f***ing scum. But I'll tell you right now I'm gonna hit the f***ing g****** send button. And and and you don't even know which 10 people it's to. And there're f***ing 6 pictures in each f***ing email." In another voicemail, Respondent demanded to JD, "Return my call. If I don't hear from you by midnight, you will regret you ever

---

[2] Because Respondent's accusation that JD suffers from mental illness factors into the arguments presented in his review briefs, we note that Respondent is not trained in psychology and lacks the credentials to make such a diagnosis, and that aside from Respondent's own assertions the record in this case otherwise is devoid of evidence that JD has been diagnosed with or treated for any mental or emotional conditions.

f***ing met me. Every day of your life will be a f***ing living hell. I will ruin your life. . . . I will f***ing wreak nothing but hatred on you every day of your life for the rest of your life if my phone does not ring by midnight. . . . You will be embarrassed every f***ing time you turn around. . . . I have every f***ing email of every person who was accepted at IU in the incoming class, it's posted on the f***ing site. I have tracked down their f***ing emails. I will destroy your m*********ing life, you f***er."

Unfortunately, Respondent repeatedly carried out these latter categories of threats, both through emails to others and through postings on various adult-oriented websites. Respondent frequently taunted JD afterwards. In one such instance, in April 2008, Respondent wrote to JD, "Just so you know, they've been up on one site since March 1, when you started this s***. 151 pictures to date; 209,748 hits! . . . The site permits people to mark their favorites and everyone loves you." Respondent added, "[You s]hould have realized that I was the best thing that ever happened to you. . . . Now, I'm through with you except for the joy I will take in revenge." In another, Respondent offered to take down some of the pictures he had posted if JD would call him immediately and admit to her alleged mental illness, but warned she only had a few minutes to do so because "I will be in court all day and out after that. I can get back to my computer at any time, but I have no intention to do so unless I hear from you . . . under my terms."

Additionally, Respondent has maintained and published for several years a blog about JD that identifies her by name and includes disparaging diatribes about her and explicit photographs of her. Respondent does not identify himself or include any pictures of himself in this blog. Even to this day, Respondent has refused to part with the blog and has refused to destroy or permanently delete the explicit photos of JD in his possession.

Despite the distance between Fort Wayne and Bloomington, Respondent's unwanted post-breakup contact with JD was not limited to telephone and electronic communications. At least twice during the spring and summer of 2008, Respondent showed up unannounced at JD's residence, and on one of these occasions JD discovered Respondent peeping into her bedroom window. In the fall of 2008, after JD had started law school, Respondent confronted JD in the school's law library and demanded she have coffee with him, refusing her pleas that he leave,

and Respondent later prevented JD from getting into her car by standing between her and her car door.

In early December 2008, Respondent wrote JD that "I'm heading down [to Bloomington]. Obviously, I have taken a step. My actions will take a second and will not be avoided. This ends tonight or tomorrow morning at the very latest, the first time you walk back into the law school. So are you going to call or not?" Respondent added, "I will tell you that I am prepared to die there." Frightened for herself and for others, JD changed her phone number and advised Respondent she would be seeking help from the police and from the law school.

A few days after JD changed her phone number, a private investigator retained by Respondent attempted to obtain JD's new phone number from JD's landlord.

JD alternately sought to block, or else not respond to, Respondent's emails. However, Respondent utilized at least seventeen different email addresses and at least one fake social media profile to communicate with JD, which hindered JD's ability to block the communications. Further, JD felt some need to keep apprised of Respondent's threats, given that Respondent frequently was following through on those threats. From time to time, JD would reply to Respondent's emails with short and straightforward statements imploring him, to no avail, to leave her alone. As the hearing officer aptly described, Respondent's emails regularly "put [JD] in a box" and left her in an impossible "Catch 22." (HO's Report ¶¶ 64-65, 119).

In June 2009, Leonard Fromm, the associate dean for students and alumni affairs at Indiana University Maurer School of Law, contacted Respondent at JD's request and asked that Respondent cease contact with JD. Respondent told Dean Fromm that Respondent was violating no law or ethical rule and was "blameless in this matter," that JD was "happily engaged in" the email communications, and that JD "has a lengthy history of mental health issues," physical abuse, self-mutilation, and substance abuse.

Thereafter, JD sought help from the Indiana University Police Department. In August 2009, a detective phoned Respondent and advised Respondent to stop contacting JD.

Respondent's response to the detective was similar to his response to Dean Fromm, and later that night Respondent sent a series of threatening emails to JD warning her against seeking a protective order. Nevertheless, there ensued a brief period in which Respondent refrained from contacting JD.

However, Respondent resumed his frequent emails in November 2009 and "continued his pattern of alternating pleas, threats and vitriol." (HO's Report ¶ 87). In April 2010, JD received an *ex parte* protective order against Respondent, and in May 2010 Respondent was arrested and criminally charged in Monroe County with felony stalking. This criminal case, which would prove to be the first of several legal proceedings spawned by Respondent's conduct toward JD, eventually was dismissed without prejudice by the State in April 2011 based on personal privacy concerns raised by JD.

Respondent continued to attempt to contact JD in 2011, both by phone and by email. JD did not reply.

In February 2012, the Commission notified Respondent that it was investigating his conduct involving JD. Ten days later, Respondent, *pro se*, filed a civil complaint in state court against JD alleging malicious prosecution and abuse of process. And in May 2012, Respondent, *pro se*, filed a second complaint in federal court against JD and others alleging unlawful arrest (the "Federal Case").[3]

Conduct involving the Commission's investigation (Count 2). During the course of the Commission's investigation into the matter involving JD, on September 18, 2012, Respondent sent a written response to the Commission stating the following:

---

[3] In addition, during some of the period of time in which Respondent was harassing JD, he was on criminal probation in Allen County as the result of a conviction for operating while intoxicated; and in a third lawsuit initiated *pro se* by Respondent, he sued his probation officer in the wake of revocation proceedings that were initiated and later dismissed as a result of the Monroe County criminal case. The state court lawsuits against JD and Respondent's probation officer, and the Federal Case against JD and others, all have resulted in awards of summary judgment for the defendants.

6

> Throughout all the prosecutions, [Respondent] has tried not to disparage [JD] nor has he even suggested that [JD] has been less than truthful with the various law enforcement and attorneys with whom she has communicated. As far as [Respondent] can remember, he's never suggested that [JD] has lied to anyone. Put simply, [Respondent] doesn't know whether she has or hasn't, because she has never testified in any proceeding relating to these matters nor has she ever been required to provide any kind of factual support under oath for the facts that others keep asserting.

Respondent had counsel at this stage of the disciplinary proceedings but testified that he personally drafted this language. (Tr. at 599).

However, several months earlier, Respondent had filed an amended complaint in the Federal Case accusing JD and others of providing false information, testimony, and evidence in connection with the Monroe County criminal case. (Pet. Ex. 31).

Conduct involving "DS" (Count 3). Respondent represented DS in two matters stemming from DS being laid off from his employment. In one of those cases, DS initially was awarded unemployment compensation benefits but later was ordered to pay the benefits back to the State due to income earned but not reported to the State during the benefit period. Respondent agreed to file an appeal for DS in the Court of Appeals if DS paid the filing fee ($250), estimated transcript cost ($283), and Respondent's flat fee ($750) up front. DS did so, and Respondent emailed DS confirmation of his engagement in the appeal and a copy of the notice of appeal that Respondent indicated would be filed that day.

However, Respondent never obtained a copy of the transcript, nor did he file an appellate brief for DS. Respondent neither consulted with nor informed DS regarding these actions. The Court of Appeals dismissed the appeal due to the failure to file an appellant's brief. Respondent did not inform DS of the appeal's dismissal. DS later was surprised to receive an approximate $8,000 claim for reimbursement from the Department of Workforce Development, because he thought his appeal was still pending. DS initially was unable to reach Respondent by phone or by email.

The next month, Respondent and DS finally spoke and reached a tentative agreement for Respondent to pay DS $4,000. However, the settlement discussions later broke down when DS sought more money. To date, DS has received no reimbursement from Respondent, including for the up-front fees paid by DS to Respondent.

## Discussion

The Commission alleged, and the hearing officer concluded following an evidentiary hearing, that Respondent violated the following Indiana Rules of Professional Conduct:

> 1.4(a)(2): Failing to reasonably consult with a client about the means by which the client's objectives are to be accomplished. (Count 3)

> 1.4(a)(3): Failing to keep a client reasonably informed about the status of a matter. (Count 3)

> 1.4(b): Failing to explain a matter to the extent reasonably necessary to permit a client to make informed decisions. (Count 3)

> 8.4(b): Committing criminal acts (stalking, harassment, and intimidation) that reflect adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer. (Count 1)

> 8.4(c): Engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. (Count 2)

After carefully reviewing the hearing officer's thorough report and the parties' submissions,[4] the Court concludes that the hearing officer's assessment of the evidence, findings of fact, and conclusions of law are well supported.

Count 1. For the most part, Respondent does not specifically challenge any of the underlying facts. However, he argues that his contact with JD during this time period was mutual, consensual, and not unwelcomed by JD. According to Respondent, JD suffers from a form of mental illness whereby her protestations that she did not want Respondent to contact her, or alternatively her silence, were actually indicative of her desire to submit to Respondent's

---

[4] Respondent's reply brief was tendered belatedly, accompanied by a motion requesting permission for belated filing. By separate order issued today, we grant that motion.

8

conduct and her voluntary participation in the events recounted above. On these points, the hearing officer found that "Respondent's testimony is simply not credible" in light of "the overwhelming documentary and other evidence." (HO's Report ¶ 122). We agree and decline Respondent's invitation to reweigh the evidence in favor of his self-serving testimony.

Respondent also contends that his actions do not amount to stalking or harassment because there is no evidence showing that (1) JD actually experienced emotional distress due to Respondent's conduct, (2) a reasonable person in JD's position would be distressed by Respondent's conduct, and (3) Respondent possessed the requisite intent. Again though, the hearing officer found to the contrary, the evidence amply supports her findings, and accordingly we decline to disturb them.

Finally, Respondent's contention that he did not intimidate JD is similarly unavailing. His argument that he did not act with the intent to induce JD to do anything against her will invites a reweighing of evidence, which we decline. Nor do we find Respondent's attempted invocation of truth as a defense to be persuasive here. Respondent's statements to others about JD's character and alleged mental illness, substance abuse, and physical abuse find no evidentiary support beyond Respondent's self-serving testimony, which was discredited by the hearing officer. Further, statements that when viewed in context amount to "true threats" to someone's safety – such as the thinly-veiled threats of violence contained in Respondent's December 2008 email to JD, by which time Respondent had left dozens of profane and abusive voicemails, sent many more similar emails, twice appeared unannounced at JD's residence, peeped into her bedroom window, confronted her in the law library, and blocked her entry into her car, among many other things – enjoy no protection.

We concur with the hearing officer's conclusion that Respondent violated Professional Conduct Rule 8.4(b) by committing criminal acts (stalking, harassment, and intimidation) that reflect adversely on Respondent's honesty, trustworthiness, or fitness as a lawyer.

Count 2. Respondent does not dispute the underlying facts, but he contends the statements he made to the Commission, that "he's never suggested that [JD] has lied to anyone"

9

or "suggested that [JD] has been less than truthful with the various law enforcement and attorneys with whom she has communicated," are not inconsistent with his pleadings in the Federal Case. As Respondent sees things, the assertions regarding JD in the amended complaint Respondent filed in the Federal Case were made in the context of Section 1983 claims alleging "conspiratorial and not testimonial acts" by JD.

We agree with the hearing officer's assessment that "Respondent's explanations are tortured and not credible." (HO's Report ¶ 153). Several paragraphs of Respondent's amended complaint alleged that JD personally provided false evidence or testimony. For example, one paragraph alleged that "[JD] additionally furthered the conspiracy by personally withholding exculpatory evidence, the provision of false evidence, and the provision of perjured testimony in furtherance of the defendants' conspiracy." Another paragraph directly accused JD and two other individuals of having "submitted false pretrial testimony under oath in connection with the false charges." And during proceedings before the hearing officer, Respondent testified in reference to the amended complaint, "[JD] did provide false information to the prosecutor's office and to the State of Indiana, that's what I am saying there." (Tr. at 615-16).

In sum, Respondent's statements to the Commission cannot be reconciled with Respondent's allegations regarding JD in the Federal Case. We therefore concur with the hearing officer's conclusion that Respondent violated Professional Conduct Rule 8.4(c) by engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation.

Count 3. With respect to his representation of DS, Respondent expressly admits the charged violations of Professional Conduct Rules 1.4(a)(2) and 1.4(b), and he advances no separate argument with respect to the hearing officer's findings and conclusions that he also violated Professional Conduct Rule 1.4(a)(3). We concur with the hearing officer's findings and conclusion that Respondent violated all three of these Rules.

Sanction. Our analysis of appropriate discipline entails consideration of the nature of the misconduct, the duties violated by the respondent, any resulting or potential harm, the respondent's state of mind, our duty to preserve the integrity of the profession, the risk to the

10

public should we allow the respondent to continue in practice, and matters in mitigation and aggravation. *See* Matter of Usher, 987 N.E.2d 1080, 1089-90 (Ind. 2013).

We have long emphasized that a license to practice law is a privilege, and that privilege is conditioned upon the faithful performance of the responsibilities imposed upon the attorney by the society that grants the privilege. *See* Baker v. Keisker, 236 Ind. 617, 620, 142 N.E.2d 432, 434 (1957). First and foremost among these responsibilities is that an attorney be of good moral character and fitness, including the attorney's conformity to the standards imposed by the law, the oath of attorneys, and our professional conduct rules. Id. Respondent's outrageous behavior falls woefully short of these standards and reflects a fundamental betrayal of the trust that has been placed in him.

Put simply, Respondent engaged in – and continues to engage in – a scorched earth campaign of revenge in the wake of being dumped by JD seven years ago, in March 2008. The scores of voicemails and thousands of emails sent by Respondent to JD are abusive, threatening, and extremely manipulative. Respondent exploited financial leverage and threats of violence and self-harm in attempting to coerce JD into communicating or meeting with him, and Respondent repeatedly carried through on his threats to disseminate intimate photos of JD and various unsupported accusations regarding her character to JD's family, friends, academic and professional acquaintances, and the general public. Respondent showed up unannounced at JD's residence, peeping into her bedroom window. Respondent also confronted JD in her law school library and later impeded her ability to get into her car and leave. After his conduct involving JD gave rise to criminal proceedings and a disciplinary investigation, Respondent filed three separate *pro se* lawsuits against JD and others, and later made duplicitous statements to the Commission in reference to those related proceedings.

Most disturbingly, despite the entreaties of JD and several others, Respondent simply has refused to take "no" for an answer. When asked at the disciplinary hearing what else JD might have told Respondent that would have convinced him to leave her alone, Respondent pointedly answered, "You know what, [c]ounsel, I don't know if there is anything she could have ever said or done that would convince me[.]" (Tr. at 510). And to this day Respondent refuses to part

11

with the blog or with the explicit photos he continues to hold as leverage against JD; Respondent instead has told JD "[y]ou will simply have the mistakes you made plastered all over for all to see for the rest of your life."

In short, Respondent's repugnant pattern of behavior and utter lack of remorse with respect to the events involving JD, his deceitful responses and lack of candor toward the Commission, his neglect involving DS's appeal, his inability or unwillingness to appreciate the wrongfulness of his misconduct, and his propensity throughout to shift blame to others and see himself as the victim, all lead us unhesitatingly to conclude that disbarment is warranted and that Respondent's privilege to practice law should permanently be revoked.

### Conclusion

The Court concludes that Respondent violated the Indiana Rules of Professional Conduct by committing criminal acts against JD that reflect adversely on Respondent's honesty, trustworthiness, and fitness as a lawyer; by engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation; and by the various shortcomings in his representation of DS.

Respondent already is under an order of suspension for failure to fulfill his continuing legal education requirements. For Respondent's professional misconduct, the Court disbars Respondent from the practice of law in this state effective immediately. Respondent shall fulfill all the duties of a disbarred attorney under Admission and Discipline Rule 23(26).

The costs of this proceeding are assessed against Respondent. The hearing officer appointed in this case is discharged.

All Justices concur.