ATTORNEY FOR THE RESPONDENT
Michael E. Brown
Kightlinger & Gray, LLP
Indianapolis, Indiana

ATTORNEYS FOR THE INDIANA SUPREME COURT
DISCIPLINARY COMMISSION
G. Michael Witte, Executive Secretary
John P. Higgins, Staff Attorney
Indianapolis, Indiana

# In the
# Indiana Supreme Court

No. 49S00-1509-DI-527

IN THE MATTER OF:

DAVID J. STEELE,

*Respondent.*

Attorney Discipline Action



**December 1, 2015**

**Per Curiam.**

The Indiana Supreme Court Disciplinary Commission charged Respondent, David J. Steele, with eight counts of misconduct involving among other things theft of client funds, retaliatory disclosures of clients' confidential information, pervasive dishonesty, and a pattern of conduct prejudicial to the administration of justice. Respondent's 2003 admission to this state's bar subjects him to this Court's disciplinary jurisdiction. *See* IND. CONST. art. 7, § 4.

Respondent already is under an order of emergency interim suspension and has tendered to this Court an affidavit of consent to discipline admitting the material facts alleged in the verified complaint. We adopt those facts, find misconduct as charged, and conclude without hesitation that Respondent should be disbarred.

**Facts**

Count 1.  Respondent misappropriated approximately $150,000 of client funds from his attorney trust account.  Respondent redirected most of these unearned fees into his personal or operating account, although he sometimes "peel[ed] off a few hundred dollars" to give to his employees as a "spot bonus."  Respondent communicated extensively with his office manager ("JD") regarding these thefts and the Disciplinary Commission inquiries prompted by these thefts.

Count 2.  At the outset of a client representation, Respondent typically would collect a $2,500 or $3,500 deposit from the client.  Respondent's fee agreements purported to render these advance fees nonrefundable, and Respondent vigorously enforced this nonrefundability provision against clients.  Additionally, Respondent instructed his office staff to inflate billable hours and rates by a variety of means.  Respondent often would use these false billing practices as retaliation against clients who requested a refund "or otherwise got crosswise with" him.  Respondent regularly communicated with JD and others within his office regarding these practices.  An illustrative example[1] is the following email Respondent sent to JD regarding one particular client:

> I simply cannot tell you how tired [I] am of these people.  How tired [I] am of hearing about the stupid f***ing transcripts she ordered on her own and [ ] expects me to split with her.  . . . You added a line to her January bill right?  A line that said, 'emails and phone calls to and from client, prepare for hearing,' right?  How much time did we put down for that?  I think [I] only told you like 4.5 hours right?  Well f*** that.  If she wants me to split the cost of those f***ing transcripts [I] told her not to get, add another 1.5 hours to that line ok?

Count 3.  Numerous clients requested refunds of unearned fees from Respondent, which Respondent was unable to provide because he had stolen virtually all the funds contained within his trust account.  Respondent stalled or avoided responding to clients requesting refunds and instructed his staff to inflate bills in an attempt to deplete the retainers advanced by clients.  When these measures failed, Respondent occasionally issued refunds to former clients using

---

[1] The verified complaint and Respondent's affidavit of consent to discipline both quote at length a significant number of emails and text messages sent by Respondent to JD and others.

retainers paid by new clients. Respondent attempted to persuade JD and others to go along with these practices and frequently reminded JD that Respondent had fired the prior office manager when that person had questioned Respondent's unethical conduct, writing to JD in one email:

> I very sincerely love that you get it – there is no giving back money unless we really trashy [sic] have to. And even then, [I] make them ask[.] I don't write checks to my clients[,] other way around. . . . Would you believe that [the prior office manager] used to f***ing argue with me about it. Argue that we should give these people their money back, ALL their money. The money [I] used to pay their salaries. It was wildly difficult. One of the many reasons [I] fired my boy.

Count 5.[2] Respondent fired JD after just two and one-half months of employment, and JD contacted the Commission to report Respondent's misconduct. Upon learning this, Respondent sent JD numerous text messages and emails threatening and intimidating JD and attempting to dissuade JD from cooperating with the Commission. In one such message, Respondent told JD, "No one will ever hire you if [I] get disbarred for something you told them. You think lawyers want someone in their office who tried to get their last boss disbarred?" In another message, Respondent disparaged JD for his sexual orientation, writing "So is this the part where [I] say I'll meet you on the playground and we can settle it like men? Or like men who [ ] are so the opposite of men that they even take their husband's last name?"

Count 6. Respondent made false statements to the Commission during its investigation that, by Respondent's own description, were "virtually pathological in frequency and scope." Respondent habitually lied in his responses to the Commission's inquiries regarding his trust account, billing and refund practices, and numerous highly derogatory statements Respondent had made about clients and various opposing counsel. Respondent also lied regarding the circumstances of JD's termination of employment, falsely telling the Commission that JD had been caught having sex with a male client in Respondent's office and that JD had gained access to the firm's website to post disparaging comments against the gay community. Additionally, Respondent brandished a handgun when he terminated JD's employment, and Respondent

---

[2] For ease of reference, our recitation of the counts of misconduct tracks the Commission's verified complaint and Respondent's affidavit of consent to discipline, in both of which "Count 4" is omitted.

instructed an associate attorney ("AA") who witnessed this incident to lie about this fact to the Commission.

Count 7. Respondent frequently lied to his clients, office staff, and third parties. Respondent also instructed his staff to "lie to all comers" regarding Respondent's whereabouts and other matters. Illustrative examples, among the many cited in the verified complaint and admitted by Respondent, include Respondent falsely telling opposing counsel that Respondent was "in a hospital room watching a loved one die of cancer" and falsely telling a client that Respondent was unavailable for a meeting because his dog had just died. Respondent regularly enlisted the aid of JD and AA to perpetuate these lies and bragged to them when the lies were successful.

Count 8. In addition to his firm's website (which includes laudatory client testimonials), Respondent maintains a profile on Avvo.com, a legal marketing website. Respondent, by his own description, "actively manipulate[d his] Avvo reviews by monetarily incentivizing positive reviews, and punishing clients who write negative reviews by publicly exposing confidential information about them." Respondent's posted responses to negative reviews also included numerous false statements. Compounding this misconduct, on at least one occasion Respondent was mistaken about the identity of a negative reviewer, prompting him to expose the confidential information of a former client other than the one who had posted the review.

Count 9. Respondent, by his own description, "record[ed] conversations of clients and potential clients for [his] own personal amusement." Respondent shared these recordings with his staff and his relatives. In another incident, Respondent instructed JD and AA to record a client conversation in his absence, again for purposes of amusement. Respondent openly mocked these recorded individuals in his conversations with others and in a meeting with the Commission.

4

## Discussion

Respondent violated these Indiana Professional Conduct Rules prohibiting the following misconduct:

1.5(a): Making an agreement for, charging, or collecting an unreasonable fee.

1.5(b): Failing to communicate the basis or rate of the fee for which a client will be responsible before or within a reasonable time after commencing the representation.

1.6(a): Revealing information relating to representation of a client without the client's informed consent.

1.9(c)(2): Revealing information relating to the representation of a former client except as rules permit or require.

1.15(a): Failing to safeguard property of clients; treating client funds as his own; failing to maintain and preserve complete records of client trust account funds.

1.15(c): Disbursing funds from a trust account for the attorney's personal use.

1.15(f): Failing to hold client funds in an IOLTA account.

1.16(d): Failing to refund an unearned fee promptly upon termination of representation.

1.18(b): Using or revealing information learned in consultation with prospective client, except as permitted by rule.

4.1(a): Knowingly making a false statement of material fact to a third person in the course of representing a client.

7.1: Making a false or misleading communication about the lawyer or the lawyer's services, including the improper use of statistical data or other information based on past performance and the improper use of statements or opinions as to the quality of services.

8.1(a): Knowingly making a false statement of material fact to the Disciplinary Commission in connection with a disciplinary matter.

8.1(b): Failing to disclose a fact necessary to correct a misapprehension known by the person to have arisen in a disciplinary matter.

8.4(b): Committing criminal acts (theft, conversion, deception) that reflect adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer.

8.4(c): Engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation.

8.4(d): Engaging in conduct prejudicial to the administration of justice.

Our analysis of appropriate discipline entails consideration of the nature of the misconduct, the duties violated by the respondent, any resulting or potential harm, the respondent's state of mind, our duty to preserve the integrity of the profession, the risk to the public should we allow the respondent to continue in practice, and any matters in aggravation or mitigation. *See* Matter of Newman, 958 N.E.2d 792, 800 (Ind. 2011).

These considerations point in a single direction here. The seriousness, scope, and sheer brazenness of Respondent's misconduct is outrageous. He stole approximately $150,000 from his clients, threatened and intimidated his staff, disparaged and mocked virtually everyone around him, lied to all comers, and obstructed the Commission's investigation. Perhaps most disturbingly, Respondent repeatedly and fundamentally breached the duty of confidentiality that lies at the heart of the attorney-client relationship. Respondent recorded privileged communications and shared those recordings with others for his own amusement, he solicited his office staff to do the same, and he posted client confidences and falsehoods on a legal marketing website in order to "punish" certain clients and inflate Respondent's own website ranking.

"We have long emphasized that a license to practice law is a privilege, and that privilege is conditioned upon the faithful performance of the responsibilities imposed upon the attorney by the society that grants the privilege." Matter of Keaton, 29 N.E.3d 103, 110 (Ind. 2015). Respondent's actions amount to a pattern of systemic and wide-ranging misconduct, and rather than express any regret or remorse for his actions or the harm they have caused, Respondent has proudly trumpeted his repugnant behavior as the *raison d'etre* of his practice. There can be no doubt in these circumstances that disbarment is warranted and that Respondent's privilege to practice law should be permanently revoked.

6

## Conclusion

The Court concludes that Respondent violated the Indiana Rules of Professional Conduct by stealing approximately $150,000 from his clients, disclosing client confidences for purposes of both retaliation and amusement, threatening and intimidating his office staff, lying pervasively to all comers, obstructing the Commission's investigation, and engaging in a pattern of conduct prejudicial to the administration of justice.

Respondent already is under an order of emergency suspension in this cause. For Respondent's professional misconduct, the Court disbars Respondent from the practice of law in this state effective immediately. Respondent shall fulfill all the duties of a disbarred attorney under Admission and Discipline Rule 23(26). The costs of this proceeding are assessed against Respondent.

All Justices concur.